# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1) Rhonda Mengert<br><br>*Plaintiff*<br><br>v.<br><br>1) U.S. Transportation Security Administration<br>2) Unknown U.S. Transportation Security Administration Agent 1<br>3) Unknown U.S. Transportation Security Administration Agent 2<br><br>*Defendants* | Case No. 19-CV-00304-JED-JFJ<br><br>JURY TRIAL DEMANDED |

## **COMPLAINT**

## **INTRODUCTION**

1) Plaintiff Rhonda Mengert ("Mengert"), a frequent flyer, United States citizen, and TSA PreCheck-cleared grandmother, was a ticketed passenger traveling through Tulsa International Airport ("TUL") on Mother's Day (May 12th), 2019.

2) Defendants are two screeners of the Transportation Security Administration ("TSA") who, after Mengert submitted to a "pat-down" search as requested by the screeners, then subjected Mengert to a strip search after the pat-down revealed that Mengert was wearing a common feminine hygiene product.

3) The strip search, during which Defendants required – without consent – that Mengert expose her genitals to them, was in direct opposition to written TSA procedures, as well as the Fourth Amendment to the United States Constitution, for which Mengert seeks damages.

## **JURY TRIAL**

4) Mengert demands a trial by jury on all issues so triable.

## PARTIES

5) Plaintiff Mengert is a natural person living in Las Vegas, NV.

6) Defendant U.S. Transportation Security Administration is a sub-agency of the United States Department of Homeland Security, sued here for injunctive relief plus fees/costs only.

7) Remaining defendants are two employees of the U.S. Transportation Security Administration who were assigned passenger screening duties at TUL on May 12th, 2019. Defendants are sued in their individual capacity for constitutional torts pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), or for state commonlaw torts under the alternative theory that their conduct so grossly deviated from their official duties as for them to be no longer acting as agents of the United States.

8) Plaintiff will use discovery to identify the true names of the defendants and will move the Court for leave to amend this Complaint with the same.

## JURISDICTION & VENUE

9) Personal jurisdiction is proper because all defendants work and, upon belief, reside, within the State of Oklahoma.

10) Subject matter jurisdiction is proper over the constitutional claims because they arise under federal law.

11) Subject matter jurisdiction is proper over the state-law claims because the Court has supplemental jurisdiction over state-law claims arising from the same transaction or occurrence, or alternatively, because the plaintiff resides in a different state than all defendants and seeks more than $75,000 in damages.

12) Venue is proper because the incident that gave rise to the complaint occurred within the Northern District of Oklahoma.

**ALLEGATIONS OF FACT**

13) On May 12th, 2019, at or around 11:45 AM, Mengert arrived at Tulsa International Airport.

14) Mengert possessed a valid boarding pass for a flight departing TUL to Las Vegas-McCarran International Airport later that day.

15) Mengert also held TSA PreCheck clearance – a trusted traveler program run by the TSA whereby passengers submit to a background check and are "cleared" by the TSA as low security risk and thereafter are subjected to reduced security screening requirements.

16) Mengert approached the TSA screening line, as was required of her as a prerequisite to boarding her flight, and presented a valid photo identification and her boarding pass – identifying her as a PreCheck-cleared individual – to a TSA travel document checker, who granted her access to the PreCheck area of the screening checkpoint.

17) Inside of the checkpoint, the TSA had a standard walk-through metal detector present for the screening of PreCheck passengers.

18) It is well-known among travelers with metal joint implants that such implants will always cause a false alarm during metal detector screening.

19) TSA body scanners, however, are able to properly clear passengers with metal implants because they do not detect items beneath the skin.

20) Accordingly, TSA procedure, upon being notified by a passenger that they have a metal implant, is to screen using a body scanner if available.

21) Mengert informed a TSA screener running the metal detector that she had a metal joint implant and, therefore, requested to be screened via body scanner.

22) Mengert indeed has a metal joint implant.

23) Mengert was screened via body scanner, but at the conclusion of that screening she was informed that she would have to submit to additional screening via pat-down.

24) Mengert agreed to submit and was compliant, non-argumentative, and did nothing that a reasonable screener would consider suspicious or meriting of additional screening.

25) TSA pat-down screening involves touching of "groin" areas using the back of screener's hands, as well as sliding of hands along the inside of the legs upwards from ankles until the screener "meets resistance."

26) The TSA uses the word "groin" and the phrase "meet resistance" because it makes people uncomfortable to say the obvious: that the search involves the touching, albeit through clothing, of the genitals of passengers.

27) During the "groin" and/or "meeting resistance" part of the pat-down, the screener touched a common feminine hygiene product that Mengert was wearing underneath her clothing.

28) Literally millions of women in the United States wear such items on any given day, and therefore finding one during a TSA pat-down is not at all an uncommon occurrence.

29) The TSA does not publish its policy on how travelers wearing feminine hygiene products are to be screened during or after a pat-down because it considers the policy – a part of the TSA's "Screening Checkpoint Standard Operating Procedures" – to be Sensitive Security Information, 49 CFR § 1520, and thus not releasable to the public.

30) However, upon information and belief, TSA policy is that there is no additional screening required: the pat-down is completed as normal, including a test for explosive trace residue on the gloves of the screener that, had the passenger been concealing explosives, would have been transferred to the gloves during the pat-down.

31) Regardless of what the exact details are, TSA has been clear and consistent in every public statement of which Plaintiff is aware that TSA screenings *never* include a strip search, and passengers will *never* be asked to remove anything but outer garments (jackets, sweatshirts, *etc.*). *See* Exhibit 1, "Screening of Elderly Passenger at JFK," Bob Burns (U.S.

Transportation Security Administration), December 4th, 2011 ("**TSA does not include strip searches in its protocols**," *emphasis in original*).

32) Yet, after the pat-down was concluded and the screener tested her gloves for explosive trace – a test which came back clear – Mengert was told she was not done.

33) A screener informed Mengert that she must go to a private room to be "cleared."

34) That screener and another – the two defendants in this case – escorted Mengert to the private room, entered, and closed the door behind them.

35) Inside the room, the screeners told Mengert that they must "clear the area" where the feminine hygiene product was detected.

36) Mengert stated that she did not understand what they were asking her to do.

37) The screeners informed Mengert that she was to take down her pants and underwear down to her knees and remove the feminine hygiene product for their visual inspection.

38) Mengert objected to the proposition that she be subject to such a strip search.

39) The screeners informed Mengert that her compliance was required.

40) Mengert complied with the screeners demand, exposing her genitals and underwear the screeners.

41) Having satisfied the screeners request and revealing that she was not carrying any prohibited items, Mengert then asked to leave, and three times her demand was ignored without any reason apparent.

42) Mengert asked a fourth time, and was granted permission to leave.

43) As would be expected, Mengert experience severe emotional distress during and after the incident.

44) In particular, during the incident, Mengert experienced racing heart, shortness of breath, uncontrollable shaking, nausea, and panic.

45) Mengert experiences these same symptoms whenever thinking of the incident.

46) Mengert is required to regularly travel via air for her job, and has already had to travel on an additional occasion in the few weeks between the date of the incident and the date of the filing of this complaint.

47) Mengert is thus regularly reminded of the incident as a result of her frequent need to traverse TSA checkpoints.

## CLAIMS FOR RELIEF

### Count 1 – Fourth Amendment to the U.S Constitution Unreasonable Search
*(Individual Defendants Only)*

48) The Fourth Amendment to the U.S. Constitution prohibits "unreasonable searches and seizures," and in general, a warrant or an exception to the warrant requirement is required before the government may conduct a search without the consent of the searched.

49) The "administrative search doctrine" allows the TSA to conduct some level of limited warrantless searches under the theory that the searches are aimed at a public safety concern rather than uncovering evidence of criminality (or, in the alternative, under the theory that by presenting one's self at the TSA checkpoint, one is consenting to the search).

50) The exception to the warrant requirement granted by the administrative search doctrine is, however, not an exception to the reasonableness requirement of the Fourth Amendment.

51) The TSA has publicly stated that they "never" strip search passengers, and has never contradicted that statement; therefore, Mengert cannot be said to have "consented" to this intrusive search (especially given her verbal objections to the same and Defendants' admonition that she was required to comply) because she had no advance notice of the same.

52) Further, Defendants were, or should have been, aware that the written standard operating procedures that directly controlled their conduct on the job prohibit strip searches.

53) The conducting of a humiliating strip search, in clear violation of agency policy, on a passenger known to have been pre-cleared as low risk, for no reason other than wearing an item that nearly every woman in the country has worn many times in her life, is a quintessential unreasonable search.

54) Any reasonable screener in the position of Defendants would have known that this search was prohibited by law and a violation of Mengert's rights

55) Mengert's constitutional rights were knowingly and intentionally violated.

56) Defendants are thus liable to Mengert for damages stemming from their unconstitutional search of her person.

**Count 2 – Fourth Amendment to the U.S Constitution Unreasonable Seizure**
*(Individual Defendants Only)*

57) Plaintiff re-alleges all paragraphs of Count 1 and incorporates them by reference.

58) According to TSA policy, Mengert was to be considered cleared to enter the sterile area of the airport from the moment that the explosive trace swab was returned negative.

59) From the moment the explosive trace swab was returned negative until Mengert was finally given permission to leave the private room, Mengert was seized without lawful authority; *i.e.,* she was unreasonably seized in violation of her Fourth Amendment rights[1].

60) Her unreasonable seizure was prolonged even beyond the strip search, where three requests to leave were ignored for no apparent reason at all.

61) Defendants are thus liable to Mengert for damages stemming from their unconstitutional search of her person.

---

[1] At least arguably, Mengert was seized before this point. Mengert is not seeking to challenge or recover for any seizure before the explosive trace swab was returned negative, because the seizure only became Fourth Amendment "unreasonable" after this point.

## Count 3 – Common-Law False Imprisonment
*(Individual Defendants Only)*

62) As an alternative theory, since TSA rules are clear that the search conducted upon Mengert was not permitted, Defendants' search of Mengert was outside the scope of their employment (and lawful authority) and they should be held liable as private citizens.

63) Mengert was detained without her consent from the moment Defendants forced her to go to the private room.

64) Defendants lacked any lawful authority whatsoever to force Mengert to go to the private room under these circumstances.

65) Defendants are therefore liable to Mengert for false imprisonment.

## Count 4 – Intentional Infliction of Emotional Distress
*(Individual Defendants Only)*

66) Under the alternative theory discussed *supra*, since TSA rules are clear that the search conducted upon Mengert was not permitted, Defendants' search of Mengert was outside the scope of their employment (and lawful authority) and they should be held liable as private citizens.

67) A strip search is a universally humiliating experience, the offensive nature of which is immediately apparent to any human.

68) Defendants forced Mengert to undress and expose her most intimate areas to them, a proposition made even more embarrassing and disturbing given Mengert's use and need for a feminine hygiene product.

69) Defendants intend their directions to cause Mengert to undress.

70) Defendants knew or should have known that doing so would cause Mengert severe emotional distress.

71) Mengert did experience severe emotional distress.

72) An employee of the government, without cause and illegally, ordering a private citizen to submit to a strip search is extreme and outrageous.

73) Defendants are therefore liable to Mengert for intentional infliction of emotional distress.

### Count 5 – Injunction

*(Defendant U.S. Transportation Security Administration Only)*

74) Agencies of the federal government are required to ensure that their employees' conduct conforms to the boundaries of the law.

75) Although the TSA has apparently set a policy of prohibiting strip searches at their checkpoints, that policy is apparently not followed by its employees on a consistent basis.

76) The TSA has regularly been accused – both in courts and in the media – of conducting unlawful strip searches, and discovery will uncover admissible evidence of such recurring conduct.

77) Mengert intends to continue to fly, as required by her work, and intends to continue to be a woman and continue to use feminine hygiene products as necessary.

78) In addition to having been injured by the TSA's failure to train, Mengert therefore has a high likelihood of being subject to the TSA's policies in the future.

79) Mengert therefore asks the Court to order the TSA to modify its policies and/or training to ensure that she is not a victim of the same in the future.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

i. Actual damages for loss of liberty, the unconstitutional search, and emotional distress, in an amount to be determined by a jury.

ii. Punitive damages on all charges, in an amount to be determined by a jury.

iii. Injunctive relief requiring the U.S. Transportation Security Administration to direct its employees that they may not strip search passengers to clear apparent feminine hygiene

  products without the further heightened suspicion as required by law (or alternatively, under any circumstances).

iv.   Cost of the action.

v.   Reasonable attorney's fees.

vi.   Any other such relief as the Court deems appropriate.

Dated: June 5, 2019           Respectfully submitted,

                _____
                Jonathan Corbett, Esq.
                Attorney for Plaintiff (Lead Counsel)
                CA Bar #325608 (*pro hac vice pending*)
                958 N. Western Ave. #765
                Hollywood, CA 90029
                E-mail: jon@corbettrights.com
                Phone: (310) 684-3870
                FAX:  (310) 684-3870


                ____s/  Melissa  Oxford_____
                Melissa Oxford, Esq.
                Attorney for Plaintiff (Local Counsel)
                OK Bar #30287
                1800 South Baltimore Ave.
                Tulsa, Oklahoma 74119
                E-mail: melissa@melissaoxfordlaw.com
                Phone: (918) 409-2844