## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| RHONDA MENGERT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19-CV-304-JED-JFJ |
| | ) | |
| U.S. TRANSPORTATION SECURITY | ) | |
| ADMINISTRATION, UNITED STATES | ) | |
| OF AMERICA, UNKNOWN AGENT 1 | ) | |
| U.S. TRANSPORTATION SECURITY | ) | |
| ADMINISTRATION, and UNKNOWN | ) | |
| AGENT 2 U.S. TRANSPORTATION | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

The Court has for its consideration the defendants' motions to dismiss (Docs. 21, 25).

### I.        BACKGROUND

Plaintiff Rhonda Mengert brings constitutional and tort claims arising from her treatment at the hands of two Transportation Security Administration screeners at Tulsa International Airport. Unless otherwise noted, the following allegations are taken from her complaint. (Doc. 12). The court takes them as true for the purposes of its analysis.

Ms. Mengert, a frequent flyer, went to the airport on May 12, 2019, to catch a flight from Tulsa to her home in Las Vegas, Nevada. After she arrived, she headed to the security checkpoint and joined the line for travelers who, like her, held TSA PreCheck clearance. As she approached the metal detector, she informed the TSA screener running it that she had a metal joint implant and requested to be screened via a body scanner, a device that does not detect items beneath the skin and is therefore able to properly clear passengers whose implants trigger the metal detector.

The screeners conducted a body scan but nevertheless told her that she would have to submit to a further, pat-down screening. She complied. During the pat-down, a procedure that involves running the back of the hand over a traveler's clothed genital area, the screener touched "a common feminine hygiene product" that Ms. Mengert was wearing underneath her clothes. (Doc. 12 ¶ 27). Although the screener's gloves tested negative for explosive material, she told Ms. Mengert that she would have to go to a private room to be "cleared."

At this point, another TSA screener joined them, and the screeners escorted Ms. Mengert into a private room and closed the door behind them. Once inside, the screeners said that they had to "clear the area" where the hygiene product was detected. (Doc. 12 ¶ 35). The screeners then instructed Ms. Mengert to take her pants and underwear down to her knees and remove the product so they could inspect it. Mengert objected, but she was told that "her compliance was required." Ms. Mengert then did as she was told, exposing her genitals and underwear for the screeners. Having demonstrated that she was not carrying any contraband, Mengert asked to leave three times but was ignored. After the fourth request, she was allowed to go.

During the encounter, Ms. Mengert suffered the symptoms of a panic attack, and she continues to suffer similar symptoms whenever she is reminded of the event. Her heart races, her throat tightens, and she begins to sweat. She begins shaking so badly that she is no longer able to stand. Because she has to travel frequently, she is regularly reminded of the incident and even suffers symptoms when she approaches non-TSA security outside the context of an airport.

In connection with these allegations, Ms. Mengert brings five claims for relief. Counts 1 and 2 bring constitutional claims against the TSA screeners under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Counts 3 and 4 allege common law torts—false imprisonment and intentional infliction of emotional distress (IIED), respectively.

Finally, Count 5 of the complaint seeks injunctive relief against TSA. Ms. Mengert claims that the TSA prohibits strip searches at checkpoints, but "that policy is apparently not followed by its employees on a consistent basis." (Doc. 12 ¶ 80). Because she travels frequently, she seeks an order directing TSA "to modify its policies and/or training to ensure that she is not a victim of the same in the future." (Doc. 12 ¶ 84). In her prayer for relief, she describes the requested injunction as an order "requiring [TSA] to direct its employees that they may not strip search passengers to clear apparent feminine hygiene products without the further heightened suspicion as required by law." (Doc. 12 at 11). Alternatively, she seeks to prohibit such searches under any circumstances. (*Id.*).

## II.     PROCEDURAL BACKGROUND

Although Ms. Mengert originally brought her IIED and false-imprisonment claims against the individual TSA agents, the Court later substituted the United States as party defendant. (Doc. 37). The FTCA provides the exclusive remedy against the United States for injury or loss of property resulting from the conduct of a government employee "acting within the scope of his office or employment." 28 U.S.C. § 2679(b)(1). This is true even when a plaintiff does not name the United States as a plaintiff in her pleadings. *Pretlow v. Garrison*, 420 F. App'x 798, 802 (10th Cir. 2011).

In this case, Ms. Mengert's complaint explicitly alleged that the TSA screeners acted *outside* the scope of their employment, thus putting the claims outside the FTCA. The Westfall Act, however, permits the government to invoke the FTCA, even when the plaintiff alleges only individual liability, by filing certification that the individual defendant was acting within the scope of his or her employment. 28 U.S.C. § 2679(d)(1). Upon the filing of the "Westfall certification," "any civil action or proceeding commenced upon [the tort claim] in a United States district court

3

shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant." *Id.*

The government filed a Westfall certification in this case with respect to the TSA agents. (*See* Doc. 8-1). Although not conclusive, a Westfall certification serves as prima facie evidence that the challenged conduct was within the scope of worker's employment, which the plaintiff then bears the burden of rebutting with specific facts. *Richman v. Straley*, 48 F.3d 1139, 1145 (10th Cir. 1995). Ms. Mengert brought forward no evidence to rebut the certification. Accordingly, the Court ruled that the TSA screeners were acting within the scope of their employment and substituted the United States as party defendant with respect to the IIED and false-imprisonment claims. (Doc. 37). Because they are tort claims against the federal government, the Court construes them as being brought under the FTCA. The FTCA does not apply to Ms. Mengert's *Bivens* claims. *Farmer v. Perrill*, 275 F.3d 958, 962–63. (10th Cir. 2001).

## III.    LEGAL STANDARDS

The defendants move to dismiss Ms. Mengert's claims for failure to state a claim under Rule 12(b)(6) and for lack of subject-matter jurisdiction under Rule 12(b)(1).

### A.    Failure to State a Claim

The Court's function on a Rule 12(b)(6) motion is not to weigh the evidence that the parties might present at trial, but to assess whether the plaintiff's complaint is legally sufficient to state a claim upon which relief may be granted. *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 757 F.3d 1125, 1135 (10th Cir. 2014). A complaint is legally sufficient only if it contains factual allegations such that it states a claim to relief that "is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Where the well-pleaded

4

facts permit the court to infer merely the possibility of misconduct, the complaint has alleged, but it has not shown, that the pleader is entitled to relief. *Id.* at 679.

In assessing a claim's plausibility, the Court must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff. *Brokers' Choice*, 757 F.3d at 1136. The Court is not bound to accept an allegation as true when it amounts to no more than a legal conclusion masquerading as fact. *Iqbal*, 556 U.S. at 678.

**B.    Lack of Subject-Matter Jurisdiction**

Federal courts are courts of limited jurisdiction whose powers are limited to those conferred by Congress. *Castaneda v. I.N.S.*, 23 F.3d 1576, 1580 (10th Cir. 1994).

> Thus, while the heart of judicial authority is article III of the Constitution, the lifeblood of the federal courts is the contents of the Judicial Code. If an act can be performed by a federal court, it is because it was permitted and not because it was not prohibited by Congress. Federal courts operate only in the presence rather than the absence of statutory authority.

*Id.* (alterations cleaned up) (quoting *Wyeth Lab. v. United States Dist. Court*, 851 F.2d 321, 324 (10th Cir.1988)). Accordingly, a plaintiff invoking the Court's subject-matter jurisdiction "must allege in his pleadings the facts essential to show jurisdiction" and, if challenged, must support those allegations by a preponderance of the evidence. *Pretlow v. Garrison*, 420 F. App'x 798, 802 (10th Cir. 2011) (quoting *Celli v. Shoell*, 40 F.3d 324, 327 (10th Cir.1994)).

Attacks on jurisdiction take two forms: facial and factual. *Gabriel v. United States*, 683 F. App'x 671, 673 (10th Cir. 2017) (citing *Holt v. United States*, 46 F.3d 1000, 1002-03 (10th Cir. 1995). A facial attack on the complaint's allegations as to subject matter jurisdiction questions the sufficiency of the complaint. *Holt*, 46 F.3d at 1002. In reviewing a facial attack on the complaint, a district court must accept the allegations in the complaint as true. *Id.* In a factual attack, the movant goes "beyond allegations contained in the complaint [to] challenge the facts upon which subject-matter jurisdiction depends." *Gabriel*, 683 F. App'x at 673 (quoting *Holt*, 46 F.3d at 1003).

When reviewing a factual attack on subject matter jurisdiction, a district court may not presume the truthfulness of the complaint's factual allegations. *Id.* A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1). *Holt*, 46 F.3d at 1003.

The Court is required to convert a Rule 12(b)(1) motion to dismiss into a Rule 12(b)(6) motion or a motion for summary judgment under Rule 56 when resolution of the jurisdictional question is intertwined with the merits of the case. *Id.* The issues are intertwined if subject-matter jurisdiction is dependent on the same statute which provides the substantive claim in the case and resolution of the jurisdictional question requires resolution of an aspect of the substantive claim. *See Pringle v. United States*, 208 F.3d 1220, 1223 & n.2 (10th Cir. 2000).

## IV.   DISCUSSION

### A.   Tort Claims

The United States argues that this court has no jurisdiction to hear either claim because Ms. Mengert failed to exhaust her administrative remedies.[1] For the reasons explained below, the Court agrees and therefore dismisses them under Rule 12(b)(1).[2]

---

1. The government offers alternative grounds for dismissal of the tort claims. With respect to the false-imprisonment claim, the government contends that the Court has no jurisdiction because the FTCA only waives sovereign immunity over such claims when the actor was an investigator or law-enforcement officer. With respect to the IIED claim, the government argues that Ms. Mengert's complaint fails to state a claim and should be dismissed under Rule 12(b)(6). Because the Court finds that Ms. Mengert failed to exhaust her administrative remedies with respect to both of these claims, the Court need not address these alternative arguments.

2. Because exhaustion is a fact on which the Court's jurisdiction depends, the government's argument presents a factual attack. Accordingly, the Court may go beyond the pleadings to resolve any factual disputes. *See Gabriel*, 683 F. App'x at 673. In doing so, the Court need not convert the motion to one for summary judgment because the jurisdictional and substantive questions are not intertwined. The issues turn on different statutes—Ms. Mengert's claims arise under 28 U.S.C. §§ 1346(b)(1), 2671, while the government's challenge to the Court's jurisdiction arises under § 2675(a)—and nothing about the inquiry into Ms. Mengert's efforts to exhaust her administrative

The FTCA operates as a waiver of the government's sovereign immunity, but that waiver is subject to several limitations, including a requirement that the plaintiff exhaust administrative remedies before bringing suit. The statute provides that

> [a]n action shall not be instituted upon a claim against the United States for money damages for injury . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail.

28 U.S.C. § 2675(a). As the plain language of the statute suggests, exhaustion is a prerequisite to bringing suit; failure to properly exhaust *before* bringing suit is generally fatal to the court's jurisdiction. *See Duplan v. Harper*, 188 F.3d 1195, 1197–1200 (10th Cir. 1999); *D'Addabbo v. United States*, 316 F. App'x 722, 725 (10th Cir. 2008); *Gabriel*, 683 F. App'x at 672. A plaintiff will not satisfy the requirement by exhausting administrative remedies after the complaint has been filed. *D'Addabbo*, 316 F. App'x 725 (citing *McNeil v. United States*, 508 U.S. 106, 111 (1993)). In other words, "[w]hen a claim is unexhausted prior to suit under the Federal Tort Claims Act, the claimant cannot 'cure the jurisdictional defect' while the suit is pending." *Gabriel*, 683 F. App'x at 672.

Here, Ms. Mengert concedes that she filed her complaint before submitting an administrative claim, but she contends that this did not rob the court of jurisdiction. The FTCA's exhaustion requirement applies only to claims resulting from the wrongful or negligent conduct of "any employee of the Government while acting *within the scope* of his . . . employment." § 2675(a) (emphasis added). Her complaint, meanwhile, explicitly alleged that the TSA screeners were acting *outside the scope* of their employment. Since her tort claims, as originally alleged, were not

---

remedies requires the Court to resolve substantive questions regarding her claim. *See Gabriel*, 683 F. App'x at 673–74.

brought under the FTCA, she argues, she did not violate § 2675(a) by filing her complaint before exhausting her administrative remedies. She contends that it was not until this court substituted the United States in place of the TSA screeners that her claims became subject to the FTCA's exhaustion requirement. By the time that happened, she claims, she had exhausted her remedies as required. Thus, in her view, § 2675(a) was satisfied—and the Court therefore has proper jurisdiction—because she exhausted her administrative remedies before the FTCA claims were "added." (Doc. 22 at 8).

This argument, though not without some superficial appeal, ultimately fails for two reasons. First, her tort claims were subject to § 2675(a)'s pre-suit exhaustion rule regardless of how she styled them in her complaint. Second, even if her complaint was not fatally premature when she filed it, the court would still lack jurisdiction because her administrative remedies remained unexhausted when the government filed its Westfall certification and her claims became subject to the FTCA.

### 1.      Ms. Mengert's tort claims are subject to § 2675(a)'s pre-suit exhaustion rule.

The Tenth Circuit does not appear to have squarely addressed the question of whether a complaint is premature for the purposes of § 2675(a) when the plaintiff initially alleges only individual liability but the government later invokes the FTCA by filing a Westfall certification. Nevertheless, the available authority seems to assume that the FTCA's pre-suit exhaustion requirement will bind a plaintiff's tort claims even when, as originally alleged, the claims were not subject to the FTCA. *See Duplan v. Harper*, 188 F.3d 1195 (10th Cir. 1999); *Gabriel v. United States*, 683 F. App'x 671 (10th Cir. 2017).

In *Duplan*, the plaintiffs sued several employees in their individual capacities and filed administrative claims a few days later. After certifying that the defendant employees were acting in the scope of their employment, the government moved to dismiss for failure to exhaust. Rather

than dismiss the claims, however, the district court, with agreement from the parties, administratively closed the case pending the agency's issue of a final decision. After the agency eventually denied the claims, the plaintiffs reopened the case and amended their complaint to add the United States as a party. Again, the government moved to dismiss, arguing that, by filing the original complaint before their claims were exhausted, the plaintiffs had created a jurisdictional defect that could not be cured by filing an amended complaint.

Reviewing the issue on appeal, the Tenth Circuit held that exhaustion was satisfied, but only because the government, after moving to dismiss the original complaint, had agreed to administratively close the case pending the agency's decision. *Id.* at 1199–1200. The court held that, as a general rule, a plaintiff must file a new suit if his first was premature, but in this case the government had agreed to administratively close the case pending the agency's decision. Thus, the district court was right to construe the amended complaint "as instituting a new action against the government." *Duplan*, 188 F.3d at 1200.

Here, it must be noted that the plaintiffs in *Duplan* appear to have conceded that their original complaint violated the pre-suit exhaustion requirement. Consequently, the Tenth Circuit was not obliged to decide the issue under consideration here. Nevertheless, *Duplan* is instructive because all the parties assumed that the pre-suit exhaustion rule applied to the original complaint even though its claims were not, on their face, subject to the FTCA. Thus, *Duplan* implicitly stands for the proposition that a pre-exhaustion complaint is premature under § 2675(a), even when its claims are only later determined to fall within the FTCA.

This reading of *Duplan* is supported by the Tenth Circuit's treatment of the claims in *Gabriel*, 683 F. App'x 671. In *Gabriel*, the Tenth Circuit held that a plaintiff's attempts to exhaust administrative remedies after filing a premature complaint were futile because the jurisdictional

defect could not be cured while the claim was still pending. *Id.* at 672 (citing *Duplan*, 188 F.3d at 1999). As it had done in *Duplan*, the court treated the plaintiff's complaint as violative of § 2675(a)'s pre-suit exhaustion requirement even though, as originally filed, the complaint brought no claim against the government.[3] Given the holdings in *Duplan* and *Gabriel*, the Court cannot but conclude that, if a plaintiff's claims are ultimately determined to fall under the FTCA, the pre-suit exhaustion requirement applies, irrespective of the manner in which the plaintiff styled the claims in his or her original complaint.

Moreover, although *Duplan* established a narrow exception to the general rule that a premature complaint cannot be cured through amendment, nothing would permit the Court to apply that exception here. In *Duplan*, the court held that the plaintiffs' amended complaint could be construed as a new action because the government, after moving to dismiss the original complaint, agreed to have the case administratively closed pending exhaustion. Nothing like that happened in this case. Moreover, while Ms. Mengert did amend her complaint, the amendment is entirely irrelevant to the question of exhaustion. Unlike the amendment in *Duplan*, which added claims against the United States, Ms. Mengert's amendment merely added allegations related to the injuries she suffered as a result of her ordeal. Because her amendment did not add any allegations against the government, it cannot possibly be construed as bringing a new, post-exhaustion action for the purposes of satisfying § 2675(a).

_____

3.   The Tenth Circuit's opinion did not lay out the full procedural history of the plaintiff's claims, but the relevant history can be found in the parties' briefing to the court and in the district court's order. *See* United States' Answer Brief at 2–6, *Gabriel v. United States*, 683 F. App'x 671 (10th Cir. 2017), 2017 WL 106212; *Gabriel v. United States*, No. 14-CV-3022-KMT, 2016 WL 9045848, at *1 (D. Colo. Aug. 29, 2016). As in *Duplan*, the government only became a party after filing certification that the original defendant, an individual, was acting within the scope of her employment.

Finally, allowing plaintiffs like Ms. Mengert to avoid § 2675(a)'s pre-suit exhaustion rule by artfully pleading around it would undermine its purpose. Congress established the exhaustion prerequisite in order to limit unnecessary litigation. *See McNeil v. United States*, 508 U.S. 106, 112 (1993) ("Every premature filing of an action under the FTCA imposes some burden on the judicial system and on the Department of Justice which must assume the defense of such actions."). Under Ms. Mengert's reading of § 2675(a), plaintiffs would be able to sidestep the pre-suit exhaustion requirement merely by alleging that individual defendants acted outside the scope of their employment, leading to the sort of wasteful litigation that § 2675(a) was meant to avoid. The better approach is to enforce the pre-suit exhaustion rule on all FTCA claims, even those not initially pleaded as such.

In sum, the Court holds that, when a plaintiff's pre-exhaustion complaint alleges individual tort claims, but the court later determines that the claims fall within the FTCA, the complaint must be considered premature under § 2675(a). Since a premature complaint creates a jurisdictional flaw that cannot be cured while the suit remains pending, *Gabriel*, 683 F. App'x at 672 (citing *Duplan*, 188 F.3d at 1199), the plaintiff's subsequent exhaustion of her claims is of no consequence. She "must file a new suit." *Duplan*, 188 F.3d at 1199. As Ms. Mengert did not file a new suit after exhausting her administrative remedies, the Court must dismiss her tort claims for lack of subject-matter jurisdiction.

### 2. Ms. Mengert's tort claims remained unexhausted when they became subject to the FTCA.

Even if Ms. Mengert's complaint, as originally filed, was not premature, the Court would still lack jurisdiction because her claims remained unexhausted when they became subject to the FTCA. According to Ms. Mengert, her claims did not become subject to the FTCA until the Court granted the government's motion to substitute the United States as a party on June 1, 2020.

11

Meanwhile, she says, TSA denied her administrative claims on July 11, 2019. Because the FTCA claims were not "added" to her complaint until well after she had exhausted her administrative remedies, she contends that the court has proper jurisdiction under § 2675(a). This argument is untenable.

Ms. Mengert is mistaken as to both of the relevant dates. First, the event that triggered the applicability of the FTCA was the government's filing of a Westfall certification, not the Court's grant of the government's Motion to substitute. The Westfall Act provides that a claim is deemed an action against the United States "[u]pon *certification*." 28 U.S.C. § 2679(d)(1) (emphasis added); *see also Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 435 (1995) (explaining that, when the government removes a state court action pursuant to a Westfall certification, the plaintiff's state-law tort claims arrive in the federal forum as FTCA claims without the need for further action by the district court). Thus, although the government filed its certification in support of a motion to substitute parties, the motion was not strictly necessary. The substitution occurred by operation of the certification itself. Had Ms. Mengert succeeded in her Westfall challenge, it would merely have resulted in the substitution's reversal. *See Gutierrez de Martinez*, 515 U.S. at 435 (describing a successful Westfall challenge as causing the dismissed employee to be "resubstituted"). Since the government filed its Westfall certification on August 16, 2019, (Doc. 8-1), that is the date at which Ms. Mengert's claims became subject to the FTCA.

Ms. Mengert is similarly mistaken as to the date her administrative claims became exhausted. Section 2675(a) provides that the exhaustion process begins when the plaintiff presents her claim to the relevant agency, but exhaustion is not complete until either (1) the claim is "finally denied by the agency in writing and sent by certified or registered mail," or (2) the agency fails "to make final disposition of a claim within six months after it [was] filed."

Here, Ms. Mengert contends that she began the exhaustion process on June 17, 2019, the date her attorney mailed TSA a signed copy of her complaint. (Doc. 22-1). Three days later the agency responded. In a letter to Ms. Mengert's attorney, the agency said that a person purporting to bring an administrative complaint on behalf of another must submit "evidence of his authority to present a claim on behalf of the claimant." (Doc. 22-2, citing 28 C.F.R. § 14.2(a)). A copy of the complaint did not qualify, the agency said, "so we are unable to deem it presented at this time." (*Id.*). On June 29, Ms. Mengert's counsel sent the agency an email arguing that the complaint should be enough, (Doc. 22-3), but TSA would not budge. On July 11, 2019, the agency reiterated its interpretation of 28 C.F.R. 14.2(a) and warned counsel that, if he failed to submit the requested evidence, "you will not have the opportunity to resolve this claim through the agency's administrative process." (Doc. 22-4).

Ms. Mengert contends that TSA's July 11 email constitutes the agency's final decision for the purposes of exhaustion, but this is plainly not the case. The correspondence she provides shows that TSA never denied the claim; it simply refused to process it.[4] Thus, even if the Court assumes that the signed complaint was sufficient to start the exhaustion process, the agency's refusal to process the claim did not become a "final decision" until the default period expired six months from the day she first sent her complaint to the agency. Consequently, her administrative remedies were not exhausted until December 17, 2019, four months after her claims became subject to the FTCA. Consequently, whether or not her original complaint violated § 2675(a), the eventual exhaustion of her administrative claims happened too late for the Court's jurisdiction to attach.

---

4.  Further correspondence, which Ms. Mengert neglected to include but which the government submitted with its replay, shows that the agency explicitly stated that its refusal to process the claim was not a final decision and that it stood ready to review the claim should Ms. Mengert's counsel provide the requested paperwork. (Doc. 23-1 at 3).

B.     *Bivens* Claims

The Constitution does not ordinarily provide a private right of action for constitutional violations by federal officials, but the Supreme Court in *Bivens*, 403 U.S. 388, approved a judicially-implied cause of action allowing individuals to seek damages for unconstitutional conduct by federal officials. The Court decided *Bivens* in the context of a search and seizure that violated a criminal suspect's rights under the Fourth Amendment, but the Court later extended the doctrine to other types of constitutional claims. In *Davis v. Passman*, 442 U.S. 228 (1979), the Court held that a federal employee could bring a *Bivens* action for violation of the "equal protection" element of the Fifth Amendment's due process clause. Then, in *Carlson v. Green*, 446 U.S. 14 (1980), the Court permitted a *Bivens* claim against federal prison officials who failed to provide adequate medical treatment in violation of the Eighth Amendment's cruel and unusual punishment clause.

*Davis* and *Carlson*, however, have proven to be the high-water mark for Supreme Court's treatment of *Bivens* claims. In the years since the Court decided those cases, it has steadily chipped away at the doctrine's applicability, refusing to imply causes of action in other contexts and for the violation of other constitutional rights. *See Corr. Serv. Corp v. Malesko*, 534 U.S. 61, 66–71 (2001) (collecting cases); *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017) (same). In *Abbasi*, the Court reiterated *Bivens*'s status as a "disfavored" remedy and further cabined the circumstances under which courts should make the remedy available to plaintiffs seeking to recover for constitutional violations committed by federal officials. *See Abbasi*, 137 S. Ct. at 1857.

When deciding whether to extend *Bivens* to a particular claim, the Court prescribes a two-step inquiry. *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020). First, a court must determine whether the claim arises in a "new context" or involves a "new category of defendants." *Id.* (citing *Malesko*, 534 U.S. at 68). If the answer is yes, a court proceeds to the second question: whether there are

14

any "special factors that counsel hesitation" in the face of the requested extension. *Id.* (cleaned up) (quoting *Abbasi*, 137 S. Ct. at 1857). If the court has "reason to pause," then extension of the *Bivens* remedy to the new context or class of defendants is inappropriate. *Id.*

Here, Ms. Mengert clearly seeks to extend *Bivens* into a "new context." The Supreme Court regards a context as "new" if it is "different in a meaningful way from previous *Bivens* cases decided by this Court." *Id.* In *Abbasi*, the Court offered a non-exhaustive list of potentially meaningful differences:

> A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Abbasi*, 137 S. Ct. at 1859–60.

Given these factors, only *Bivens* itself can be said to have involved a context even remotely similar to the one under consideration here. In *Bivens*, Bureau of Narcotics agents raided the plaintiff's apartment, cuffed him, and searched his home as his wife and children looked on. *Bivens*, 403 U.S. at 389. They then took him to a federal courthouse where they interrogated him, booked him, and subjected him to a "visual strip search." *Id.* The plaintiff sought to recover for their alleged violation of the Fourth Amendment right against unreasonable searches and seizures. Here, Ms. Mengert also alleges Fourth Amendment violations involving a "strip search" at the hands of rank-and-file officials, but the similarities end there.

Two major differences distinguish the context of Ms. Mengert's claims from that of the claims in *Bivens*. First, while *Bivens* also implicated the Fourth Amendment, the nature of the search in *Bivens* was fundamentally different than the one here. In *Bivens*, officers acting in a traditional law-enforcement role searched the plaintiff's home as part of a criminal investigation,

allegedly without a warrant. *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 409 F.2d 718, 719 (2d Cir. 1969). Here, the parties seem to agree that the challenged conduct occurred during an administrative search at the security checkpoint of a public airport. This is a material distinction. The Fourth Amendment right is at its apogee when the challenged search entails the invasion of a person's home. *See United States. v. United States District Court*, 407 U.S. 297, 313 (1972) ("[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed . . . ."). Absent a warrant supported by probable cause, search of a person's home is presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 589–90 (1980). Administrative searches, by contrast, require neither a warrant nor probable cause, the rationale being that, due to some "special need," the public's interest in maintaining the search regime outweighs the privacy interests of the individuals who are subjected to it. *See Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 666–67, 678–79 (1989). Thus, even though both claims implicate the Fourth Amendment right against unreasonable searches and seizures, the contours of that right are different.

Second, the officials in *Bivens* were operating under a statutory mandate entirely distinct from that of the TSA screeners. The Bureau of Narcotics, which no longer exists, was established as an arm of the Treasury Department "[i]n order to aid in the detection and prevention of the unlawful importation of narcotic drugs into the United States." Act of June 14, 1930, ch. 488, Pub. L. No. 71-357, 46 Stat. 585, 586 (1930). Meanwhile, the Transportation Security Administration was established under the Aviation and Transportation Security Act. *See generally* Pub. L. No. 107-71, 115 Stat. 597 (2001). As implied by the name of the agency and the legislation that created it, TSA's legal mandate is transportation security. And, as explained further below, this mandate raises special concerns counseling hesitation that were not present in *Bivens*.

16

Because Ms. Mengert's claims involve a different type of government actor, conducting a different type of search, for a different reason, the Court finds that Ms. Mengert's *Bivens* claims arise in a "new context." The question, then, is whether the Court should recognize a cause of action under these circumstances.

At least two special factors counsel hesitation. First, "TSA employees are tasked with assisting in a critical aspect of national security—securing our nation's airports and air traffic." *Vanderklok v. United States*, 868 F.3d 189, 207 (3d Cir. 2017). National security matters are rarely fit for judicial intervention because "[n]ational-security policy is the prerogative of the Congress and President." *Abbasi*, 137 S. Ct. at 1861 (citing U.S. Const. art. I, § 8; art. II, § 1, § 2). Second, recognizing a damages remedy for Fourth Amendment violations in the context of airport screenings has the potential to be highly disruptive. Hundreds of millions of passengers pass through TSA's screening checkpoints every year,[5] and each of these interactions entails the invasion of a person's privacy. Whether a particular invasion violates the Fourth Amendment will necessarily be a question of degree. Clearly, the potential for personal liability would discourage overreach by TSA screeners, but it also risks chilling their willingness to engage in thorny—but constitutionally valid—exercises of their authority, thereby putting the public at risk.

Whether damages should be recoverable for constitutional violations committed by the federal government is an issue implicating separation-of-powers principles. It is a question of "who should decide"; Congress, or the courts? *Abbasi*, 137 S. Ct. at 1857. In this case, given the "host of considerations that must be weighed and appraised," the question should be committed to

---

5. *TSA Year in Review: A Record Setting 2018*, (Feb. 7, 2019), http://www.tsa.gov/blog/2019/02/07/tsa-year-review-record-setting-2018 (noting that nearly 814 million passengers and flight-crew passed through TSA checkpoints in 2018).

"'those who write the laws' rather than 'those who interpret them.'" *Id.* (quoting *United States v. Gilman*, 347 U.S. 507, 512–513 (1954)).

**C.      Injunctive Relief**

The government moves to dismiss Ms. Mengert's claim for injunctive relief (Count 5), on the grounds that the Court lacks subject-matter jurisdiction to hear it. By statute, the Courts of Appeals have exclusive jurisdiction to "affirm, amend, modify or set aside" an "order" issued by TSA. 49 U.S.C. § 46110. Here, Ms. Mengert seeks an order directing TSA "to modify its policies and/or training" so she will not be subjected to similar searches in the future. (Doc. 12 ¶ 84). The government contends that this amounts to a request that the Court review TSA's Screening Checkpoint Standard Operating Procedures (SOP), a nonpublic document that, according to the government, qualifies as an "order" for the purposes of § 46110. Since the Courts of Appeals have exclusive authority to review such orders, the government argues that Ms. Mengert's requested relief is beyond this Court's power to grant.

Multiple courts have held that the Screening Checkpoint SOP is an "order" within the meaning of § 46110. *See Blitz v. Napolitano*, 700 F.3d 733, 740 (4th Cir. 2012); *Corbett v. United States*, 458 F. App'x 866, 869 (11th Cir. 2012); *Durso v. Napolitano*, 795 F. Supp. 2d 63, 69 (D.D.C. 2011). And Ms. Mengert does not argue to the contrary. Accordingly, to the extent Ms. Mengert wishes to modify TSA's screening procedures and policies, the Court agrees that it has no jurisdiction to hear her request.

That being said, not all of her requested relief implicates § 46110. In her complaint, she alleges that TSA policy prohibits strip searches and that the TSA agents in question violated that policy when they ordered her to disrobe so they could verify the contents of her underwear. Thus, when viewed in the context of her complaint as a whole, Ms. Mengert appears not to take issue with TSA's screening procedures themselves, only the degree to which TSA agents comply with them. The

government does not explain how an order directing TSA to comply with its own policy would require the Court to "modify" the SOP or any other order. This is not to say that Ms. Mengert will prevail on the merits, only that, to the extent Ms. Mengert seeks an order related to the proper training and enforcement of its policies, § 46110 presents no barrier to the Court's exercise of jurisdiction over that request. Accordingly, the government's motion is denied as to Count 5 of Ms. Mengert's complaint.

## V.        Conclusion

For the reasons stated above, motion to dismiss (Doc. 25) is **granted** in its entirety. Motion to dismiss (Doc. 21) is **granted** as to Counts 3 and 4 and **denied** as to Count 5. The Court dismisses Counts 1 and 2 with prejudice because the circumstances of Ms. Mengert's constitutional claims precludes recognition of a cause of action under *Bivens*.[6] The Court dismisses Counts 3 and 4 without prejudice but declines to grant Ms. Mengert leave to amend because the failure to exhaust administrative remedies before bringing tort claims under the FTCA cannot be cured by filing an amended complaint.

SO ORDERED this 30th day of November, 2020.

_____
JOHN E. DOWDELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT

---

6.  Dismissal with prejudice is appropriate when a claim is dismissed for failure to state a claim under Rule 12(b)(6) and amendment would be futile. *See Grossman v. Novell, Inc.*, 120 F.3d 1112, 1126 (10th Cir. 1997).